IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:10CR3088 |
| | ) | |
| v. | ) | |
| | ) | |
| RUSSELL HART, | ) | FINDINGS AND RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

Defendant Russell Hart has filed a motion to suppress statements he made while in the custody of law enforcement officers on August 6, 2010, (filing no. 16).  For the reasons set forth below the motion should be granted in part and denied in part.

STATEMENT OF FACTS

On August 6, 2010, Hart was arrested in Indianola, Nebraska on a parole violation originating from California.  United States Deputy Marshals Jeremy Schultz and William Banks joined with local law enforcement personnel to form the arrest team.  At the time of the arrest, the deputies knew the alleged parole violation was an out-of-state matter, but they were not aware of the underlying offense.  Hart was not advised of his Miranda rights when arrested and taken into custody.

Hart was taken to the Red Willow County jail and was processed by members of the Red Willow County Sheriff's Office in the booking room.[1] Deputy Banks was present for most of the booking.  During the course of the booking, Hart was asked a number of biographical questions including his name and address.  When asked for an address, Hart

---

[1]A recording of the booking and questioning was submitted as plaintiff's Exhibit 1.

identified himself as homeless, but stated he had been living in Cambridge, Nebraska with his sister.

During the questioning, a law enforcement officer from Red Willow County asked Hart what the original charge was with respect to the parole violation. Hart indicated he had failed to register as a sex offender in California. Deputy Banks asked Hart if he was supposed to register anywhere. Before Hart could answer, the Red Willow County deputy sheriff asked Hart how long he had lived in Nebraska. Hart responded he had lived in Furnas County for "about a month." An officer then asked Hart if he had registered in the County, to which Hart responded that he had not.

The Red Willow County officers continued the booking process and Deputy Banks left the room to talk to Deputy Schultz. Based on Hart's responses to questioning during booking, Deputy Banks informed Deputy Schultz of a potential "Adam Walsh" violation.[2] Deputy Schultz then called the Marshal's office in Lincoln, Nebraska to talk to a senior deputy and ascertain the information needed to determine whether Hart had violated federal law by failing to register as a sex offender in Nebraska.

Approximately thirty minutes after the initial questioning regarding whether Hart had registered as a sex offender in Nebraska, Deputies Banks and Schultz entered the booking room. Deputy Schultz asked Hart if he would answer a few questions for them. Hart agreed and Deputy Schultz presented a Miranda waiver form to Hart. Deputy Schultz read the form to Hart and asked Hart to initial and sign the form if he agreed to waive his Miranda rights. Hart agreed to do so and initialed and signed the form (Ex. 2).

---

[2] "Adam Walsh violation" is the common term used by law enforcement officers to refer to a sex offender who has failed to register pursuant to 42 U.S.C.A. §§ 16901 - 16991.

Deputy Schultz proceeded to question Hart about how long he had lived in Nebraska, what his parole violation entailed, and if he had registered as a sex offender in Nebraska. Hart confirmed his earlier statement, explaining he had lived in Nebraska for about a month and had not registered as a sex offender. Deputy Banks was present during the questioning and asked Hart if he moved to Nebraska as soon as he was released from the California penal system. Hart indicated he had. The questioning lasted only a few minutes.

## LEGAL ANALYSIS

Hart argues his statements regarding his failure to register as a sex offender in Nebraska should be suppressed. He asserts the initial pre-Miranda statements must be suppressed because Hart did not receive Miranda warnings prior to custodial interrogation. He argues the post-Miranda statements must be suppressed because the two-stage questioning was used as an integrated and calculated attempt to elicit a confession from him. The United States argues the pre-Miranda statements should not be suppressed because the initial questioning of Hart was not an "interrogation," and Hart's post-Miranda confession should not be suppressed because Hart knowingly and voluntarily waived his Miranda rights and the statement was not coerced.

The admissibility of Hart's statements is governed by two United States Supreme Court decisions that dealt with the admissibility of confessions made before and after the administration of Miranda warnings: Oregon v. Elstad, 470 U.S. 298 (1985) and Missouri v. Siebert, 542 U.S. 600 (2004).

In Elstad, the police went to the defendant's home because they suspected the defendant was involved in a burglary. The police arrested the defendant in his house, but prior to giving him Miranda warnings the defendant incriminated himself in response to

3

police questioning. The defendant was taken to the police station about an hour later and was properly Mirandized. He waived his rights and provided a second confession to the police. After he was convicted, the defendant claimed his confessions must be suppressed.

Elstad held the defendant's pre-Miranda statement must be suppressed because the "failure to administer Miranda warnings create[d] a presumption of compulsion." Elstad, 470 U.S. at 307. However, the Elstad court specifically found the unwarned statements were not solicited through coercive tactics by the police and were, in fact, voluntarily made. Id. Although, this finding did not prevent the suppression of the initial confession, it had a significant impact on how the Court analyzed the second confession. The Court explained:

> It is an unwarranted extension of Miranda to hold that a simple failure to administer the warning, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.

Elstad, 470 U.S. at 309.

In finding the second confession should not be suppressed, the Court noted "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." Elstad, 470 U.S. at 318. The admissibility of any statements made after an unwarned, but voluntary and uncoerced statement "should turn on whether [the subsequent statement] is knowingly and voluntarily made." Id. at 309. Thus, the Court held Elstad's second statement would be admissible so long as it was made voluntarily. Id. at 316-17. The Court further determined that the administration of the Miranda warnings at the station was sufficient to "remove the conditions that precluded admission of the earlier statement." Id.

4

at 314 . Citing factors such as the lapse in time between interrogations and the change of setting, the Court found Elstad's second confession was voluntary and, thus, admissible. Id.

In response to the holding in Elstad, some law enforcement officers began employing a strategy known as "question first" interrogations, whereby a confession would be elicited from a suspect and then the law enforcement officer would provide Miranda warnings and ask the suspect to repeat his or her confession. Applying Elstad to such cases, some courts upheld the admissibility of the second confessions. See Seibert, 542 U.S. at 609-11(discussing the use of the"question-first" technique).

Seibert explored the propriety of the "question first" interrogation technique and whether Miranda warnings given immediately following an unwarned confession could adequately advise a suspect of his or her rights. Seibert involved a defendant suspected of murder who was arrested, taken into custody at the police station, and questioned for 30 to 40 minutes. She confessed to the killing. After a twenty-minute break, she received Miranda warnings, waived her Miranda rights, and after being reminded of her pre-warning statements, repeated her confession. The interrogating officer admitted he intentionally withheld the Miranda warnings in order to first elicit the first confession. Id. at 605-06.

A divided Court held that both the pre- and post-warning statements were inadmissible. The four-justice plurality listed a number of factors to determine whether "midstream" Miranda warnings could properly present the suspect with "a genuine choice of whether to follow up on the earlier admission" including: the completeness of the initial questioning, the timing and setting of the two confessions, the continuity of the police personnel, and the degree to which the interrogator's questions treated the two rounds of questioning as continuous. Id. at 615-16. Applied to the facts of Seibert, the plurality found

"that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." Id. at 617.

Justice Kennedy concurred in the judgment, but offered a narrower test to determine when post-warning statements should be suppressed. Id. at 621-22. "If the deliberate two-step strategy has been used, post-warning statements that are related to the substance of pre-warning statements must be excluded unless curative measures are taken before the post-warning statement is made." Id. at 622. However, where the two-step interrogation was not "deliberate" or "used in a calculated way to undermine the Miranda warning," the admissibility of the post-warning statement is governed by Elstad and the statement would be suppressed only if found to be involuntarily made. Id. Thus, Justice Kennedy established a distinction between intentional and unintentional use of a two-step interrogation in evaluating the impact of a "midstream" Miranda warning. Id.

Because the Seibert opinion was a plurality and Justice Kennedy's opinion provided the fifth vote for the majority decision and was "decided on narrower grounds than the plurality opinion," his opinion is controlling.[3] See United States v. Torres-Lona, 491 F.3d

---

[3]Hart relies heavily on the Eighth Circuit's analysis in the United States v. Aguilar, 384 F.3d 520 (8th Cir. 2004) in which the court applied the factors from the Seibert plurality in determining the impact of mid-questioning Miranda warnings on the post-warning confession. The Eighth Circuit has since clarified that Justice Kennedy's concurrence – not the plurality test – controls cases analyzed under Seibert, and the key issue is whether the questioning was part of a "calculated strategy to circumvent Miranda," not the application of the factors identified by the plurality opinion. See Ollie, 442 F.3d at 1142 (noting Justice Kennedy's opinion is controlling even though the Eighth Circuit had invoked the Seibert plurality opinion in other similar cases); Torres-Lona, 491 F.3d at 758-59.

750, 758 (8th Cir. 2007); United States v. Briones, 390 F.3d 610, 613 (8th Cir. 2004). Thus, where there is no "calculated effort" to "circumvent Miranda requirements," Elstad controls the outcome and the "post warning confession is admissible so long as it was knowingly and voluntarily made." Torres-Lona, 491 F.3d at 758-59. The United States bears the burden of proving, by a preponderance of the evidence, that the law enforcement officers' failure to provide Miranda warnings before the initial questioning was "not part of a deliberate attempt to circumvent Miranda." United States v. Ollie, 442 F.3d 1135, 1142-43 (8th Cir. 2006).

Based on the opinions in Elstad and Seibert, the court must address whether the pre-Miranda questioning of Hart was an "interrogation" for the purposes of Miranda and, if so, whether the pre-Miranda confession was voluntary; whether the law enforcement officers engaged in an intentional and calculated effort to circumvent Miranda through multiple stages of questioning; and whether Hart's post-Miranda confession was voluntary.

    A.    Pre-Miranda Statements.

        1.    Interrogation

When an individual is in custody and subjected to interrogation without the benefit of Miranda warnings, his statements are irrebuttabley presumed to be the result of compulsion. See Elstad, 470 U.S. at 306-07 (1985)(internal citations omitted). An "interrogation" for the purposes of Miranda occurs "when the officer's interaction with the suspect is 'likely to elicit an incriminating response.'" Torres-Lona, 491 F.3d at 757. (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). Any statements made while a suspect is in custody, without the benefit of prophylactic warnings regarding his Fifth Amendment rights, require suppression under the principles set forth in Arizona v. Miranda, 384 U.S. 436 (1966). See Elstad, 470 U.S. at 309; Ollie, 442 F.3d at 1140.

Routine biographical data often requested during booking procedures does not fall under the auspices of Miranda.  See United States v. Ochoa-Gonzalez, 598 F.3d 1033, 1038 (8th Cir. 2010).  However, if a law enforcement officer should be reasonably aware that questions asked during booking procedures may elicit incriminating responses and are substantially related to the charged crime, Miranda warnings must be given prior to questioning.  See United States v. McLaughlin, 777 F.2d 388, 391-92 (8th Cir. 1985) (if law enforcement officer should "reasonably be aware information sought, while merely basic information in usual cases, is directly relevant to substantive offense charged" booking becomes interrogation subject to Miranda); see also United States v. Parra, 2 F.3d 1058, 1068 (10th Cir. 1993)(routine "booking questions" do not encompass questions related to immigration status if questions are asked to elicit incriminating evidence).

There is no question Hart was in custody following his arrest and during booking at the Red Willow County jail.   He was not free to leave.  The issue is whether the officers' questioning of Hart during the booking process was interrogation; that is, likely to elicit incriminating information.

Pursuant to federal law, convicted sex offenders must notify the jurisdiction where he or she resides of any change of name, residence, employment, or student status within three business days of that change.  See 42 U.S.C.A. § 16913(c).  The Red Willow County law enforcement officers and Deputy Banks asked Hart questions that directly implicated his culpability under the Adam Walsh laws.  Although the initial question regarding his residence likely falls within the "booking exception" to Miranda warnings, the follow-up questions (e.g., length of time in the state, and status and requirement to register in Nebraska as a sex offender) did not.   The law enforcement officers should have known that follow-up questions regarding Hart's residency and registration status were directly related to a potential violation of the Adam Walsh laws and could cause Hart to incriminate himself.  See

8

McLaughlin, 777 F.2d at 391-92 (noting Miranda is implicated when question pertains to underlying offense and law enforcement officers should reasonably know the question could elicit incriminating information). Hart's pre-Miranda statements regarding his length of residency in Nebraska, his registration requirements, and his failure to register as a sex offender in Nebraska should be suppressed.

        2.     Voluntary Confession

Although suppression of the initial confession is required, the analysis of the first confession does not end with such a finding. Elstad, 470 U.S. at 307-08. Here, where Hart made a subsequent confession after being advised of his Miranda rights, the court must also determine if the first confession was voluntarily made or if it was coerced. See United States v. Briones, 390 F.3d 610, 614 (8th Cir. 2004) (noting whether the initial confession was voluntary or coerced impacts the analysis of the admissibility of the second confession).

The Miranda violation creates a presumption that the statements were compelled, but the statements may nonetheless be voluntary within the meaning of the Fifth Amendment. Id. In making a determination of voluntariness, "the finder of fact must examine the surrounding circumstances and entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." Elstad, 470 U.S. at 318. To determine voluntariness, the court will examine "whether, in light of the totality of the circumstances, the pressures exerted by the authorities overwhelmed the defendant's will." United States v. Robinson, 20 F.3d 320, 322 (8th Cir. 1994). "The fact that a suspect chooses to speak after being informed of his rights is highly probative." Elstad, 470 U.S. at 318. In addition, "[c]oercive police activity is necessary predicate to finding that a confession is not voluntary in the constitutional sense." Robinson, 20 F.3d at 322.

The video of Hart's interrogation does not reveal circumstances or law enforcement conduct sufficient to "overwhelm" Hart's will. See Robinson, 20 F.3d at 322. The booking room was 10-by-12 feet, four uniformed officers were present, and the defendant's feet were shackled. However, the tone of the booking proceedings was conversational, Hart was not handcuffed and was completely cooperative, there was no physical or mental coercion, and no weapons were drawn or visible. Hart did not appear under the influence of drugs or alcohol, and provided appropriate responses to the officers' questioning. Hart had past experience with the criminal justice system, during which he would have been informed of his right to remain silent and right to counsel. Considering the totality of these facts, although Hart's unwarned incriminating statements regarding his Nebraska residency and failure to register must be suppressed under Miranda, they were made voluntarily and not as a result of coercion.

      B.     Post-Miranda Statements

           1.     Interrogation

Under the Kennedy concurrence in Seibert, the court must determine whether the law enforcement officers carried out a calculated two-step interrogation process designed to circumvent Miranda. See Torres-Lona, 491 F.3d at 758-59 (noting Justice Kennedy's concurrence controls in the Eighth Circuit). If a calculated two-step interrogation process was conducted, the statements will be suppressed unless law enforcement officers took steps to cure the initial tainted confession. Seibert, 542 U.S. at 622. If a calculated two-step interrogation was not conducted, the second confession will be admissible if it was voluntarily made. Id.

Unlike Seibert, the United States has met its burden of showing the interrogations of Hart were not a planned two-step process calculated to circumvent the requirements of Miranda. Hart was questioned both times in the same booking room, Deputy Banks was present during both sessions of questioning, and very little time passes between the two sessions of questioning. However, Deputies Banks and Schultz were not trained to employ an "ask first" interrogation technique, nor did they discuss interrogating Hart about his registration status before arresting him or even after he was in custody. Indeed, they were aware Hart was wanted on a parole violation, but did not know the nature of the underlying offense at the time of Hart's arrest. The initial questioning was the spontaneous result of the booking process. Any claim that Hart's initial confession was the result of a calculated effort or plan is seriously undermined by the fact that before purposefully initiating post-Miranda questioning, Deputy Schultz contacted the Marshal's office in Lincoln to gather information on the elements of the crime and an outline of questions to ask. The post-Miranda questioning was generally conversational in nature and Hart was cooperative. The deputies never referred to Hart's previous statements during the second interrogation, thus; providing further evidence the two interrogations were not integrated. Seibert, 542 U.S. at 621. Deputies Banks and Schultz did not engage in an intentional and calculated two-step interrogation process to undermine Hart's Miranda rights.

      2.     Voluntary Second Confession

As with the initial confession, the government has met its burden of proving Hart's second confession was voluntary and should not be suppressed. See Seibert, 542 U.S. at 622. There was a complete absence of any "threats, violence, or direct or implied promises such that the 'defendant's will [was] overborne and his capacity for self-determination critically impaired.' " United States v. Gannon, 531 F.3d 657, 661 (8th Cir. 2008) (quoting United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995). Hart was read his Miranda rights,

11

acknowledged that he understood his rights, and elected to waive them. Such conduct is "highly probative" that the waiver and confession were voluntarily made. See Elstad, 470 U.S. at 318. Hart never requested an attorney, did not ask for the questioning to stop, and did not refuse to answer any questions. In short, Hart's post-Miranda confession was voluntary and, under Elstad and Seibert, should not be suppressed.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. § 636(b), that the motion to suppress filed by Russell Hart (filing no. 16) be granted in part and denied in part as follows:

1) Defendant Hart's pre-Miranda statements regarding his length of residency in Nebraska, his sex offender registration requirements, and his failure to register as a sex offender in Nebraska should be suppressed.

2) In all other respects, defendant Hart's the motion to suppress should be denied.

The parties are notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

DATED this 30th day of November, 2010.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

12